Receipt number AUSFCC-11099170

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## (BID PROTEST)

ALABAMA DEPARTMENT OF
REHABILITATION SERVICES,

    *Plaintiff,*

v.

UNITED STATES,

    *Defendant.*

Case No. **26-279 C**

Judge _____

## COMPLAINT

For its bid protest complaint against the United States of America, Plaintiff Alabama Department of Rehabilitation Services ("ADRS") shows the Court as follows:

## Nature of the Action

1. This bid protest involves the United States Department of Defense ("DOD"), Department of the Army's Dining Excellence Initiative ("DINEX") and Commercial Solutions Opening ("CSO") W5168W-26-R-A017 (the "DINEX CSO"). ADRS protests the Army's decision to use the DINEX CSO to acquire food services under its prototype "other transaction" or "OT" authority.

## The Parties

2. ADRS is an Alabama state agency created in 1994. ADRS serves Alabamians with disabilities, including through its Business Enterprise Program for blind vendors providing food and cafeteria services under the Randolph-Sheppard Act of 1936, as amended (the "RSA"). *See* Ala. Code § 21-9-9(7); Ala. Admin. Code § 795-7-1-.01(1); *see also* 20 U.S.C. §§ 107a(a),

107b.  Through the RSA, ADRS has won several food services contracts for military installations in Alabama, including at Fort Rucker, Alabama where it is the long-time incumbent contractor.

3.    Defendant the United States of America, for all purposes relevant hereto, acted by and through Army.

## Jurisdiction and Standing

4.    The Court has jurisdiction to hear this bid protest under the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996.  28 U.S.C. § 1491(b)(1).  The Tucker Act empowers the Court of Federal Claims to "render judgment on an action by an interested party objecting [1] to a solicitation by a Federal agency for bids or proposals for a proposed contract or [2] to a proposed award or [3] the award of a contract or [4] any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." *Id.*; *see Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 84 (2020) (dividing the Tucker Act into four prongs).  *But see SRA Int'l, Inc. v. United States*, 766 F.3d 1409, 1412 (Fed. Cir. 2014) (dividing the Tucker Act into three prongs).

5.    This protest involves an increasingly common situation where a DOD component plans to use its OT authority to acquire goods or services.  (*See* Exhibit 1, DINEX CSO, p. A004[1] ("This CSO is issued . . . under the authority of 10 U.S.C. 4022."); 10 U.S.C. §§ 4021-22 (codifying DOD's OT authority); *Raytheon Co. v. United States*, 175 Fed. Cl. 281, 290 (2025) ("[I]n recent years, DOD's exercise of its OT authority has increased nearly ten-fold in use and

---

[1] All "Exhibit" citations refer to the exhibits in the Appendix to this Complaint.  Page citations for those exhibits ("p. A#") refer to the Appendix's consecutively numbered Bates stamps.

five-fold in value.").

6.      OTs are "transactions [] other than contracts, cooperative agreements, and grants."  *See* 10 U.S.C. § 4021(a).  OTs "generally [are] not subject to the Federal laws and regulations limited in applicability to contracts, grants, or cooperative agreement" and are "not required to comply with the [FAR] and its supplements."  *See* 32 C.F.R. § 3.2.  The Court of Federal Claims has held that OTs are not typical procurement contracts.  *See Space Expl. Techs. Corp. v. United States*, 144 Fed. Cl. 433, 435 (2019) ("OTs are agreements that are not procurement contracts[.]").

7.      Several Court of Federal Claims cases have examined the interaction between DOD's OT authority and the Tucker Act.  *See Space Expl. Techs. Corp.*, 144 Fed. Cl. at 433; *Kinemetrics, Inc. v. United States*, 155 Fed. Cl. 777 (2021); *Hydraulics Int'l, Inc. v. United States*, 161 Fed. Cl. 167 (2022); *Indep. Rough Terrain Ctr., LLC v. United States*, 172 Fed. Cl. 250 (2024); *Raytheon*, 175 Fed. Cl. at 281; *Telesto Grp., LLC v. United States*, 176 Fed. Cl. 711 (2025).  Recognizing that the Federal Circuit has interpreted the terms "procurement" and "proposed procurement" broadly,[2] *Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008), and the "very sweeping scope" of the Tucker Act's "in connection with" language, *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999),

---

[2] The Tucker Act does not define the terms "procurement" or "proposed procurement."  *See Distributed Sols., Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008).  However, the Federal Circuit has adopted the definition of "procurement" currently found in 41 U.S.C. § 111. *Raytheon Co. v. United States*, 175 Fed. Cl. 281, 288 (2025) (citing *Distributed Sols.*, 539 F.3d at 1345-46).  That definition covers "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout."  41 U.S.C. § 111.

most judges have found jurisdiction over OT protests.[3]  *See Kinemetrics*, 155 Fed. Cl. at 784-85 (J. Lettow); *Hydraulics Int'l*, 161 Fed. Cl. at 176-79 (J. Holte); *Indep. Rough Terrain*, 172 Fed. Cl. at 256-60 (J. Davis); *Raytheon*, 175 Fed. Cl. at 287-293 (J. Bonilla); *Telesto Grp.*, 176 Fed. Cl. 726-36 (J. Hertling) (finding jurisdiction over some claims but not others).  And at least one Senior United States District Court judge found the Court of Federal Claims has exclusive jurisdiction over certain challenges to OTs.  *See MD Helicopters*, 435 F. Supp  3d 1003, 1013 (D. Ariz. 2020) (J. Teilborg).

8.      There is some disagreement over the precise boundaries of the Court of Federal Claims' OT protest jurisdiction, but only as to whether there is jurisdiction during the "performance of the prototyping phase of an OT."  *Compare MD Helicopters*, 435 F. Supp. 3d at 1013, *and Kinemetrics*, 155 Fed. Cl. at 785, *and Hydraulics*, *Int'l*, 161 Fed. Cl. at 179, *and Raytheon*, 175 Fed. Cl. at 295, *with Telesto*, 176 Fed. Cl. at 732-33.  That is not an issue in this case because ADRS challenges the DINEX CSO at the outset, and the DINEX CSO contemplates both a prototype OT and a follow-on, non-competitive production agreement.  (*See* Exhibit 1, pp. A005, A022.)  This type of dispute falls within the jurisdictional bounds established in all recent Court of Federal Claims OT cases.[4]  *See Telesto*, 176 Fed. Cl. at 733

---

[3] The only case where the Court of Federal Claims did not exercise jurisdiction over some portion of the OT claims before it was *Space Exploration Technologies Corporation v. United States*.  144 Fed. Cl. 433 (2019).  But the holding of that case was explicitly limited to the facts before the court.  *See id.* at 442 n.4.  And our facts are much different because the DINEX CSO does not contemplate a "separate and distinct" FAR-based solicitation, but "a single prototype" OT that could result in a follow-on production agreement.  *See id.* at 443-45; (Exhibit 1, pp. A005, A007-10, A022.)

[4] The Government Accountability Office would also likely exercise jurisdiction over this protest. *See, e.g.*, *Oracle Am., Inc.*, B-416061, May 31, 2018, 2018 CPD ¶ 180, at *7 ("[The Government Accountability Office] will review . . . a timely protest that an agency is improperly using its other transaction authority.").

("[A]n OT may be challenged at the outset for compliance with the OT statutes . . . and regulations and other generally applicable laws."); *MD Helicopters*, 435 F. Supp 3d at 1013; *Kinemetrics*, 155 Fed. Cl. at 785; *Hydraulics, Int'l*, 161 Fed. Cl. at 179; *Indep. Rough Terrain*, 172 Fed. CL. at 259-60; *Raytheon*, 175 Fed. Cl. at 295.

9.    Setting those recent decisions aside, the Court has jurisdiction over this case because it challenges DOD's decision to use the DINEX CSO, instead of a FAR-based contract, to procure food services.  The Court of Federal Claims has repeatedly held the procurement vehicle itself is irrelevant when the question is whether the government had authority to use that vehicle in the first place.  *See Tolliver Grp.*, 151 Fed. Cl. at 104; *Mlinqs, LLC v. United States*, No. 22-1351, 2023 WL 2366654, at *16 (Fed. Cl. Mar. 6, 2023); *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 533 (2011).  The Court has jurisdiction to hear this protest.

10.    ADRS is an interested party.  To establish statutory standing under the Tucker Act, the protester "must allege facts which, if true, 'establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest.'"  *Telesto*, 176 Fed. Cl. at 725 (quoting *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006)).  In a pre-award protest, an offeror "may establish a direct economic interest by demonstrating the solicitation or bidding process caused it to suffer a 'non-trivial competitive injury'" that can be redressed by judicial relief.  *Id.* (quoting *Weeks Marine v. United States*, 575 F.3d 1352, 1361-62 (2009).  This standard applies when a "prospective bidder," like ADRS, "challenges the solicitation's terms, 'prior to actually submitting a bid.'"[5]  *Id.* (quoting *Orion Tech., Inc. v. United States*, 704 F.3d

---

[5] In this case, the DINEX CSO serves as a solicitation for the award of a prototype OT agreement.  (*See* Exhibit 1, p. A005 ("[The Army] anticipates awarding a fixed-price agreement for a single prototype.").)  A CSO "is a competitive solicitation process with three-phases focused on being "fast, flexible, & collaborative."  Off. of the Undersecretary of Def. for

1344, 1348 (Fed. Cir. 2013)).  Where the government's action unreasonably affects a protester's ability to compete, it has suffered a non-trivial competitive injury.  *See, e.g.*, *Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 227 (Fed. Cir. 2019); *CW Gov't Travel, Inc. v. United States*, 99 Fed. Cl. 666, 673 (2011); *State of N. Carolina Bus. Enters. Program v. United States*, 110 Fed. Cl. 354, 366 (2013).

11.  ADRS is Alabama's state licensing agency or "SLA" for RSA purposes.  *See* 20 U.S.C. §§ 107a(a)(5), 107(b); Ala. Code § 21-9-9(7); Ala. Admin. Code § 795-7-1-.01(1). Under the United States Department of Education's regulations, ADRS is the state entity that formally bids on food services contracts for relevant blind vendors.[6]  *See* 34 C.F.R. § 395.33; *State of N. Carolina Bus. Enters. Program*, 110 Fed. Cl. at 358 n.1.

12.  Using the DINEX CSO, the Army plans to award a prototype, food services OT agreement for two locations:  Fort Rucker in Alabama and Fort Lee in Virginia.  (Exhibit 1, p. A005.)  ADRS is the long-time incumbent for these services at Fort Rucker, which the Army has acquired using FAR-based contracts.  ADRS's current contract (W9124J20D0005) runs through May 2026.

13.  If the prototype OT is successful, the Army may award a non-competitive production OT requiring performance at Army bases across California, Arizona, Oklahoma,

---

Acquisition & Sustainment, *Other Transactions Guide* 34 (2023).  CSOs are intended for "innovative prototype projects."  *Id.*

[6] We recognize that the Army has been granted a blanket-exemption from the RSA, which gives SLAs and blind vendors a priority in "the operation of vending facilities on Federal property." *See* 20 U.S.C. § 107(b).  Though that is not an issue before this Court in this case, that exemption has been challenged in a Maryland federal court.  *See Taylor v. United States Dep't of Educ.*, 1:26-CV-00402 (D. Md. filed Jan. 30, 2026).

Missouri, Kansas, Kentucky, Georgia, South Carolina, and Virginia.  (Exhibit 1, p. A005.)

14.    Legally and practically, ADRS cannot effectively compete for or provide the services the DINEX CSO contemplates.  For starters, it is at least an open question as to whether SLAs can operate outside their state's borders.  In at least one instance, the Rehabilitation Services Administration said they cannot.  (*See* Exhibit 2, Department of Education, Rehabilitation Services Administration Opinion, pp. A026-28.)[7]  But even setting that issue aside, practical constraints prevent ADRS from competing for this work like a traditional commercial entity.

15.    If ADRS bid on and won the prototype OT, it would have to perform in Virginia immediately, and potentially other states.  But operating out of state would require ADRS to follow other states' laws, in coordination with other state governments, which follow different procedures and rules in choosing blind vendors and teaming partners.  Moreover, ADRS has no personnel in these other states, so it would incur substantial travel expenses and startup/administrative costs that would make performance burdensome, costly, and impractical, especially in light of recent federal funding cuts decreasing ADRS's budget.  Practically, there is no way for ADRS to offer a competitively viable solution, even assuming it can operate outside of Alabama's borders.

16.    Because the DINEX CSO has affected ADRS's ability to compete, it has caused a non-trivial competitive injury that can be redressed by judicial relief.  *See, e.g.*, *Am. Relocation Connections, L.L.C.*, 789 F. App'x at 227; *CW Gov't Travel, Inc.*, 99 Fed. Cl. at 673; *State of N.*

---

[7] The Rehabilitation Services Administration later reconsidered, recognizing that SLAs could potentially partner together to bid on and perform multistate contracts.

*Carolina Bus. Enters. Program*, 110 Fed. Cl. at 366. That means the DINEX CSO has affected ADRS's direct economic interest in bidding on the work it has provided at Fort Rucker for years.

## The Applicable Pleading Standard

17.    The *Twombly / Iqbal* pleading standard applies at the Court of Federal Claims. *See Vanquish Worldwide, LLC v. United States*, 147 Fed. Cl. 390, 399 (2020). As Judge Kaplan noted in that decision, "a party need only plead 'facts to state a claim to relief that is plausible on its face,' with facts sufficient to nudge 'claims across the line from conceivable to plausible.'" *Id.* (first quoting *TrinCo Inv. Co. v. United States*, 722 F.3d 1375, 1380 (Fed. Cir. 2013); and then quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Further, under *Iqbal*, "[a] claim is plausible on its face when 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

18.    The *Vanquish* decision involved appeals under the Contract Disputes Act. *See id.* at 398. The government moved to dismiss the plaintiff's complaint for failure to state a claim, alleging that its breach claims were based on "mere 'suspicions,'" that did not meet the pleading standards under *Twombly* and Rule 8, RCFC. *Id.* at 401. Judge Kaplan disagreed and wrote:

> Fairly read, Vanquish's complaint alleges as a matter of fact that USTRANSCOM did not follow the OML process and that, had it been followed, Vanquish would have been assigned more missions than in fact it was assigned. **To be sure, Vanquish makes this allegation "on information and belief."** But that does not preclude it from meeting the *Twombly* plausibility standard, as the government contends. *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (observing that "[t]he *Twombly* plausibility standard ... does not prevent a plaintiff from 'pleading facts alleged on information and belief' where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of

8

culpability plausible"); 5 Arthur R. Miller et al., *Federal Practice and Procedure* § 1224 (3d ed. 1998) ("Although there is no express authorization in the federal rules for pleading on information and belief, allegations in this form have been held to be permissible, even after the Twombly and Iqbal decisions."); *see also Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1330 (Fed. Cir. 2009) (reasoning that a plaintiff is permitted to make allegations based on information and belief even under heightened pleading standards, such as those established for fraud under Fed. R. Civ. P. 9(b), "when essential information lies uniquely within another party's control," at least "if the pleading sets forth the specific facts upon which the belief is reasonably based").

*Id.* at 401 (emphasis added) (internal citations omitted). As Judge Kaplan noted, the Federal Circuit has approved of "information and belief" allegations "'when essential information lies uniquely within another party's control,' at least 'if the pleading sets forth the specific facts upon which the belief is reasonably based.'" *Id.* (quoting *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1330 (Fed. Cir. 2009)); *see also Innova Hosp. San Antonio, LP v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 730-31 (5th Cir. 2018) ("[W]hile a plaintiff must offer sufficient factual allegations to show that he or she is not merely engaged in a fishing expedition or strike suit, we must also take account of his or her limited access to crucial information. This is because if plaintiffs cannot state a claim without pleading facts which tend systemically to be in the sole possession of defendants, the remedial scheme of the statute will fail, and the crucial rights secured by ERISA will suffer." (citations and internal quotation marks omitted)); *City of Evanston v. N. Ill. Gas Co.,* 229 F. Supp. 3d 714, 721 (N.D. Ill. 2017) ("Pleading on information and belief is a 'practical necessity' that is 'desirable and essential [ ] when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject.'"); *Gonzalez v. Cnty. of Merced*, No. 116CV01682LJOSAB, 2017 WL 2345681, at *7 (E.D. Cal. May 30, 2017), *report and recommendation adopte*d, No. 1:16-CV-1682-LJO-SAB, 2017 WL 2812928 (E.D. Cal. June

29, 2017) ("Pleading on information and belief is a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject." (internal quotation marks omitted)).

19.     The DINEX CSO is publicly available.  However, the Army's internal planning documents are not available, and those likely reflect the Army's reasoning for acquiring these services under its prototype OT authority.  Accordingly, ADRS bases its allegations below on its own knowledge, publicly available documents and where appropriate, information and belief. Under the applicable pleading standard, ADRS's allegations are more than sufficient to state a claim.  *Exergen Corp.*, 575 F.3d at 1330.

**Factual Allegations**

The History of DOD's Prototype OT Authority

20.     The Soviet Union launched Sputnik I on October 4, 1957, making it the first nation to send a man-made satellite into space.  Heidi M. Peters, Cong. Rsch. Serv., R45521, *Department of Defense Use of Other Transaction Authority: Background, Analysis, and Issues for Congress* 1 (2019).[8]  That began the Space Race.  *Id.*  Concerned about the United States' ability to compete with the Soviet Union, Congress held a series of "emergency" hearings to respond to the Sputnik launch.  *Id.*  Congress introduced a bill that eventually became the National Aeronautics and Space Act of 1958 and created the National Aeronautics and Space

---

[8] Judges considering DOD's OT authority have often cited this report.  *See Hydraulics Int'l, Inc. v. United States*, 161 Fed. Cl. 167, 175 (2022); *Indep. Rough Terrain Ctr., LLC v. United States*, 172 Fed. Cl. 250, 257 (2024); *Raytheon Co.*, 175 Fed. Cl. at 290.

Administration or "NASA." *Id.*; *see* National Aeronautics and Space Administration Act of 1958, Pub. L. 58-568, 72 Stat. 426.

21.    To give NASA the ability to move quickly and compete with the Soviets, Congress granted it broad authority to "enter into and perform such contracts, leases, cooperative agreements, and *other transactions* as may be necessary to accomplish its mission of research and exploration."  Peters, *supra*, at 1 (emphasis in original) (quoting National Aeronautics and Space Administration Act § 203).  Over the years, Congress extended OT authority to various agencies.  *See, e.g.*, 49 U.S.C. § 106(l)(6) (Federal Aviation Administration); 49 U.S.C. § 5312 (Department of Transportation).

22.    In 1989, Congress enacted 10 U.S.C. § 2371, which granted DOD OT authority for research projects.  *See* National Defense Authorization Act ("NDAA") for Fiscal Years ("FY") 1990 and 1991, Pub. L. 101-189, § 251, 103 Stat. 1352.   The FY94 NDAA gave the "Director of the Advanced Research Projects Agency" authority to carry out "OTs for prototype projects" that were "directly relevant to weapons or weapons systems proposed to be acquired or developed by the [DOD]."  NDAA FY 1994, Pub. L. 103-160, § 845, 107 Stat. 1547; Peters, *supra*, at 24-25.  This prototyping authority remained as a note to § 2371, where it was expanded, contracted, and eventually codified separately in 10 U.S.C. § 2371b.  Peters, *supra*, at 25-32; NDAA FY 2016, Pub. L. 114-92, § 815, 129 Stat. 893.

23.    Congress ultimately removed the "weapons or weapons systems" language from DOD's OT authority, broadening it to include "prototype projects that are directly relevant to enhancing the mission effectiveness of military personnel and the supporting platforms, systems, components, or materials proposed to be acquired or developed by the Department of Defense, or

11

to improvement of platforms, systems, components, or materials in use by the armed forces."

*See* 10 U.S.C. § 2371b (effective Nov. 25, 2015 to Dec. 11, 2017); NDAA FY 2016, § 815.

After a series of moves across the United States Code, DOD's prototype OT authority eventually

came to rest in 10 U.S.C. § 4022. *See* NDAA FY 2022, Pub. L. 117-81, § 1701(u), 135 Stat.

1541.

24.     The FY23 NDAA defined "prototype project," which had no binding definition

until that point.[9]  Congress said a "prototype project" was one that involved:

(A) a proof of concept, model, or process, including a business process;

(B) reverse engineering to address obsolescence;

(C) a pilot or novel application of commercial technologies for defense purposes;

(D) agile development activity;

(E) the creation, design, development, or demonstration of operational utility; or

(F) any combination of subparagraphs (A) through (E).

NDAA FY 2023, § 843; 10 U.S.C. § 4022(e)(5).

The DINEX CSO

25.     The Army released the DINEX CSO in draft on December 11, 2025, as a

---

[9] Until 2017, DOD's OT guides generally described a "prototype project" as "a physical or virtual model used to evaluate the technical and manufacturing feasibility or military utility of a particular process, concept, end item, or system."  Off. of the Undersecretary of Def. for Acquisition & Sustainment, *Other Transactions Guide* 12 (2002).  After 2017, DOD adopted a definition that closely resembled the later statutory definition.  *See* Off. of the Undersecretary of Def. for Acquisition & Sustainment, *Other Transactions Guide* 4 (2017).  By 2018, DOD's definition was nearly identical to the current statutory definition.  *See* Off. of the Undersecretary of Def. for Acquisition & Sustainment, *Other Transactions Guide* 31 (2018).

combined endeavor between the Mission and Installation Contracting Command and Army Sustainment Command.  The Army issued the final DINEX CSO on January 22, 2026.  (*See* Exhibit 1, pp. A001-25.)  The Army expressly relied on its prototype OT authority under 10 U.S.C. § 4022.  (*Id.*, p. A004.)

26.    The DINEX CSO's stated purpose is to meet the "distinct" needs of the Army's Transformation & Training Command ("T2COM") garrisons, where "operations must align with fixed training schedules and concentrated dining flow rates."  (Exhibit 1, p. A004.)  Through the DINEX CSO, the Army hopes to acquire "innovative, flexible solutions that deliver superior outcomes compared to the existing food service model."  (*Id.*)

27.    "To facilitate bold and innovative solutions," the Army says it is "proactively seeking to provide maximum flexibility by reviewing and potentially waiving traditional constraints."  (*Id.*, p. A006.)  The Army says it will waive constraints in four key areas:

- **Sourcing**: An exception from the mandatory use of the Defense Logistics Agency (DLA) as a primary food source to allow for greater supply chain efficiency and flexibility.

- **Menu** Standards: Relief from rigid menu and nutritional requirements (e.g., Soldier Feeding Initiative (SFI) to allow for more creative, palatable, and healthy menu offerings based on commercial best practices.

- **Facilities & Equipment**: A willingness to explore models where the contractor has greater control over facility maintenance, repairs, and equipment installation, potentially on a reimbursable basis, to avoid delays associated with traditional processes.

- **Legacy Systems & Regulations**: Openness to solutions that do not rely on legacy systems like the Army Food Management Information System (AFMIS) or manual processes outlined in regulations like AR 30-22, provided a more efficient and secure alternative is proposed.

(Exhibit 1, pp. A006-07 (emphasis added).)

28.     The DINEX CSO anticipates a single fixed-price prototype OT agreement based on a three-phase evaluation process.  (Exhibit 1, p. A005.)  In Phase 1, the Army will solicit solution briefs that address the single area of interest: "Enhanced Food Service Operations for T2COM garrisons[.]"  (*Id.*, pp. A004, A007.)  In a document accompanying the DINEX CSO, the Army elaborated on its area of interest, describing the "[p]roblem" it faces like this:

> The Army recognizes the need to modernize their feeding concept. The new millennium Soldier identifies with a more open, inviting facility atmosphere and the Army realizes that moving toward a campus style feeding concept will provide the environment to increase Soldier morale and well-being. The Army traditionally operates in a disciplined and focused process to provide a more restrictive dining experience and the traditional contracts to support these operations were very detailed and under focused surveillance. The Army realizes that to modernize the feeding environment they will have to shift legacy contract and feeding operations and incorporate more campus style contracting processes that allow increased menu options and station style feeding concepts while still meeting the nutritional and dietary requirements to sustain Soldiers. The Army understands the need to improve dining options to support vegetarian, kosher, and halal meals for those select Soldiers with those requirements to ensure that personnel in a training setting maintain holistic health and fitness.

(*Id.*, p. A024.)  As for its "[g]oals," the Army said:

> The Army recognizes that solving this requires a new approach. The Army is therefore not seeking incremental improvements, but a fundamental shift. To achieve this, the Army is adopting a "whiteboard" approach, inviting our commercial partners to propose their ideal, end-to-end dining solutions, unconstrained by the legacy processes that have historically hindered innovation. Specifically, the Army is seeking relief from traditional barriers, including mandatory sourcing requirements, rigid menu standards, and legacy technology systems, to enable a truly modern dining experience for our Soldiers. This fundamental shift to T2COM dining facility feeding activities will replace the legacy system of contracts and feeding across the wide spectrum of Army installations with commercial practices.

(*Id.*)  The Army also listed the objectives it hoped the DINEX CSO will achieve:

- Harness the expertise of commercial food service industry partners and introduce innovative dining solutions within the Army's complex food service enterprise at multiple T2COM locations.

- Modernize dining facility services to provide station style feeding while effectively synchronizing with supported unit's training schedules to accommodate high-volume, concentrated dining flow rates.

- Sustain industry and Army standards for cleanliness and sanitation within all areas of the dining facilities to ensure a safe and healthy environment.

- Pioneer a flexible partnership model that quantifies the value of removing legacy constraints. This initiative will validate the operational, financial, and experiential benefits achieved when commercial partners are empowered to deploy their proven, end-to-end solutions, free from traditional barriers in sourcing, menu design, facility management, and technology.

(*Id.*, pp. A024-25.)

29.    By February 20, the Army wants interested parties to provide a solution brief that "demonstrate[s] how the proposed solution introduces innovative procedures, practices, or methods not currently employed by the Army, or how modifications to existing practices could deliver measurable financial savings, increased efficiency, or operational improvements." (Exhibit 1, pp. A007-08.)  The Army plans to evaluate solution briefs for (i) relevance to the area of interest; (ii) innovation and differentiation; (iii) feasibility and scalability; (iv) path to validation and impact; and (v) the "degree to which [the] offeror's solution brief does or does not permit the Government to competitively procure such support in the future from third parties." (*Id.*, p. A012.)

30.    In Phase II, the Army plans to invite companies with "meritorious" solution briefs

to a site visit. (Exhibit 1, p. A008.) That visit will provide "direct exposure to the facility layout, staffing practices, supply chain operations, and meal service execution." (*Id.*) The Army hopes this will "help participants refine, adapt, and validate their proposed solutions so that final proposals balance innovation with operational practicality." (*Id.*) "Following the site visit, companies will be invited to present their concept in a live pitch session, conducted in person," with the intent of highlighting the distinctiveness, feasibility, and expected impact of the proposed solutions. (*Id.*) The pitch session will be followed by a question-and-answer session with the Army's evaluation panel. The Army will evaluate pitches for (i) clarity of concept; (ii) innovation and distinction; (iii) practical feasibility; (iv) expected benefits; (v) engagement and responsiveness; and (iv) "The degree to which [the] offeror's pitch does or does not permit the Government to competitively procure such support in the future from third parties." (*Id.*, pp. A014-15.)

31. Finally, in Phase III, companies still viewed as viable will submit a "full written proposal for a Prototype [OT agreement]." (Exhibit 1, p. A009.) This will allow the Army to "[d]own-select to the most promising prototype(s) for execution and validation." (*Id.*) The Army will evaluate final proposals for how well they (i) address the area of interest; (ii) demonstrate innovation and impact; and (iii) show feasibility and scalability. (*Id.*, A019.)

32. The Army says it will not evaluate proposals using a formal point system or adjectival ratings. (Exhibit 1, p. A010.) Instead, the Army says it will undergo a qualitative peer review, employing an interactive and collaborative evaluation process. (*Id.*) This could include dialogue with participants to "clarify submissions, refine proposed approaches, and negotiate technical, business, and pricing terms." (*Id.*)

33.     The eventual prototype will be tested at two locations: Fort Lee, Virginia and Fort Rucker, Alabama.  (Exhibit 1, p. A005.)  If the prototype is successful, the Army says it may transition into a follow-on production OT agreement, without further competition and in accordance with 10 U.S.C. § 4022(f), to enable the Army to "scale proven innovations across additional dining facilities, garrisons, or mission environments." (*Id.*, pp. A005, A022.)  If the prototype is not successful, the Army says it will "re-engage with previous participants under [the DINEX] CSO or issue a new CSO to obtain alternative solutions." (*Id.*, p. A005.)

**Count One**
**The Army's use of its OT authority to procure these services is unreasonable and contrary to law.**

34.     ADRS adopts and incorporates the allegations from the paragraphs above, as if fully set out herein.

35.     The Court of Federal Claims reviews bid protests under the APA's arbitrary and capricious standard.  *See, e.g.*, *DigiFlight, Inc. v. United States*, 165 Fed. Cl. 588, 597 (2023). Under that standard, the Court of Federal Claims will sustain a protest if it concludes the government's action was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(2)).  That is an apt description for the Army's decision to circumvent the traditional contracting process and buy food services under the DINEX CSO.

36.     As mentioned above, the DINEX CSO relies on 10 U.S.C. § 4022, which permits OTs for "prototype projects."  (Exhibit 1, p. A004.)  However, the food services the DINEX CSO describes do not qualify as a "prototype project," so using the DINEX CSO to acquire them is unreasonable and contrary to law.

17

37.     The DINEX CSO seeks ordinary contractor food services, not innovative products, processes, or goods—the vendor will not invent new food.  Instead, it will provide a "campus style feeding concept" with "increased menu options" and "station style feeding" "while still meeting the nutritional and dietary requirements to sustain soldiers."  (Exhibit 1, p. A024.)  It will also provide sanitation services, sourcing, menu design, modernization, and facility management.  (*Id.*, pp. A024-25.)  In short, the Army wants to use its OT authority to hire someone to feed soldiers and maintain dining operations.[10]

38.     Repeating the word "innovative" over and over does not transform the ordinary food services the DINEX CSO describes into something new or novel.  Indeed, the Army is buying these very services under FAR-based contracts.  As the Army admitted, it has already "launched a robust modernization effort through the Campus Style Dininig Venue Initiative" or "CSDVI."  (Exhibit 1, p. A004; *see also* Exhibit 3, Excerpts from the CSDVI Solicitation.)  The CSDVI, like the DINEX CSO, is intended to provide "greater variety, flexible hours, and improved dining environments."  (Exhibit 5, Samantha Tyler, *Army launching campus-style dining concept to enhance Soldier experience*, p. A186.)

39.     Like the DINEX CSO, the CSDVI includes a "feeding alternative to what is described as the Army's legacy dining facility operations."  (Exhibit 3, p. A038.)  It desires a "modernized feel, supported by advanced technologies such as online ordering and delivery options" and an "abundance of health food options to soldiers."  (*Id.*)  Similar to the DINEX CSO, the CSDVI program focuses on access to increased menu items and station style feeding.

---

[10] The services the DINEX CSO seeks meet the definition of a "service contract," which is defined as a "contract that directly engages the time and effort of a contractor whose primary purpose is to perform an identifiable task rather than to furnish an end item of supply."  *See* 48 C.F.R. § 37.101.

(*See id.*, pp. A038, A058, A140; Exhibit 5, p. A185; Exhibit 6, Capt. Gabrielle Hildebrand, *Army launches revolutionary campus-style dining to modernize Soldier fueling*, p. A189.)   The CSDVI program also includes many of the same waivers to traditional barriers the DINEX CSO promises.  (*Compare* Exhibit 1, pp. A006-07 (stating the Army is providing relief from the mandatory use of the Defense Logistics Agency, menu standards, and systems and regulations), *with* Exhibit 7, Jared Serbu, *Army set to debut new 'campus-style' dining model, beginning with Fort Hood*, p. A186 (listing similar waivers for CSDVI).)  And, like the DINEX CSO, the CSDVI requires contractors to not only provide the food, but manage the venue.  (*See* Exhibit 1, pp. A006, A025; Exhibit 3, p. A054; Exhibit 5, p. A186; Exhibit 6, p. A190.)

40.     The only real difference between the CDVSI and the DINEX CSO is that the locations in which the Army now seeks services have "fixed training schedules and concentrated dining flow rates."  (Exhibit 1, p. A004.)  In other words, there is high volume.  But the volume at which the contractor provides services does not change the fundamental nature of those services.  And as we have seen, there is nothing new or innovative about the food services the Army is seeking to procure through the DINEX CSO.  Moreover, the government is already buying similar high-volume food services at several places, including the Federal Law Enforcement Training Center in Brunswick, Georgia.

41.     Turning back to the statutory definition of a "prototype project," *see* 10 U.S.C. § 4022(e)(5), there are only two parts that the Army could even arguably meet:  "(A) a proof of concept, model, or process, including a business process," and "(E) the . . . demonstration of operational utility."  *Id.*  Looking closer, neither applies.

42.     Because the Army is already buying almost identical food services under the

CSDVI, the DINEX CSO cannot be fairly said to be seeking a "proof of concept, model, or process." 10 U.S.C. § 4022(e)(5)(A). For that same reason, the Army is not seeking a contractor to provide a "demonstration of operational utility." 10 U.S.C. § 4022(e)(5)(A). Again, the Army is already buying food services that provide the very benefit DINEX will (hopefully) provide. (*See* Exhibit 3, p. A038 (noting a "Campus Style Dining Venue (CSDV) [] will deliver a Soldier feeding operation that will not only support Soldiers, but their Families").)

43.    Legislative history shows Congress did not want DOD agencies to use OT agreements to circumvent traditional FAR-based contracting. Congress originally limited DOD's prototype OT authority to projects directly relevant to "weapons and weapons systems." NDAA FY 1994, § 845; Peters, *supra*, at 24-25. That limitation remained for more than twenty-five years. NDAA FY 2016, § 815.[11] The Army will likely argue that by removing the weapons-focused limitation, Congress wanted DOD to have much broader authority. Broader for sure, but broad enough to completely circumvent the FAR just by claiming to want something other than what DOD is already getting? Absolutely not.

44.    First, it is not at all clear that DOD agencies can use OTs to buy any type of service. The Navy seems to think OTs cannot be used for traditional services. (*See* Exhibit 4, Naval Air Systems Command OT Protype Project Presentation, p. A168 ("An OT is NOT for Services, Maintenance, or Construction." (underlining and red omitted).) And DOD's Prototype Guide defines a "prototype" as "a model (e.g., physical, digital, conceptual, and analytical) built to evaluate and inform its feasibility and usefulness." Off. of the Undersecretary of Def. for

---

[11] The "weapons and weapons systems" requirement is still present in implementing regulations. *See* 32 C.F.R. §§ 3.1, 3.3. And at least one Court of Federal Claims judge seems to think the limitation still applies. *See Telesto Grp.*, 176 Fed. Cl. at 735 n.10.

Acquisition & Sustainment, Prototyping Guidebook 2 (2022) (italics omitted).  These standards certainly prevent OTs for services such as the food services at issue in this case.

45.     Further, Congress has repeatedly expressed concern that DOD could use its OT authority to circumvent congressional intent and the public policies enshrined in the acquisition process.  Peters, *supra*, at 9.  For example, the FY99 NDAA committees emphasized their view that OT authority should be used in a limited manner, saying, "[t]he conferees continue to believe that [OT] authority should only be used in the exceptional cases . . . The conferees are especially concerned that such authority not be used to circumvent the appropriate management controls in the standard acquisition and budgeting process."  H.R. Rep. No. 105-736, at 590 (1998).  And as recently as 2018, Congress echoed similar concerns:

> The committee also urges the Department to reiterate through established guidelines that [OT authority] is not a means for circumventing appropriate use of the Federal Acquisition Regulations, and that full and open competition should be used to the maximum extent possible to maintain a sense of integrity, fairness, and credibility in the Federal Procurement process.

 H.R. Rep. No. 115-676, at 75-76 (2018).  With the DINEX CSO, Congress's fears appear to have come true.

46.     Likely emboldened by recent executive orders setting "a general preference for Other Transactions Authority . . . to promote streamlined acquisitions," *see, e.g.*, Exec. Order No. 14265, 90 FR 15621, the DINEX CSO circumvents the FAR in the name of easing administrative burden.  There is simply no legitimate reason these services cannot and should not be acquired through traditional procurement methods, as they have been for years, and as the CSDVI is doing right now.

21

47.    If Congress wanted to allow DOD to procure all goods and services through its OT authority, it could easily have written a statute granting such authority.  But it did not.  Rather, it limited DOD's prototype OT authority to the types of "prototype projects" described by statute.  Shown above, the food services at issue here do not fall within that category.  By seeking to acquire these services through a CSO, with the intent of awarding a prototype OT agreement, the Army is acting contrary to law.  *See DigiFlight, Inc.*, 165 Fed. Cl. at 597.  Allowing this acquisition to go forward would effectively end DOD's mandatory adherence to the FAR.

48.    The Army's unlawful actions have prejudiced ADRS.  Explained above, the DINEX CSO anticipates performance at multiple locations, in multiple states across the country, preventing ADRS from competing or performing, even assuming it is lawful for an SLA to operate beyond its borders.  There is no question the Army's unreasonable actions have caused ADRS to suffer a non-trivial competitive injury that can be redressed by judicial relief.  *See, e..g.*, *Weeks Marine*, 575 F.3d at 1361-62; *Glenn Def. Marine (Asia) PTE Ltd. v. United States*, 97 Fed. Cl. 568, 576 *dismissed*, 459 F. App'x 906 (Fed. Cir. 2011); *Piedmont Propulsion Sys., LLC v. United States*, 167 Fed. Cl. 72, 89 (2023).  Thus, the Court should sustain this protest.

**Prayer for Relief**

WHEREFORE, ADRS requests that this Court:

A.    Issue a preliminary injunction preventing the Army from awarding a prototype

OT agreement under the DINEX CSO;[12]

B.    Declare that the Army's decision to acquire food services through the DINEX

CSO is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law;

C.    Permanently enjoin the Army from acquiring these food services through the

DINEX CSO or any other CSO or prototype OT agreement;

D.    Order the Army to select a different method of acquiring these services that

complies with the law; and

E.    Award ADRS such other and further relief as this Court may deem just and

proper.

Dated:  February 19, 2026                          Respectfully submitted,

                                                   /s/ W. Brad English
                                                   W. Brad English

OF COUNSEL
Emily J. Chancey
Taylor R. Holt
Hunter M. Drake
MAYNARD NEXSEN PC
655 Gallatin Street SW
Huntsville, Alabama 35801
256.512.5705
benglish@maynardnexsen.com
echancey@maynardnexsen.com
taholt@maynardnexsen.com
hdrake@maynardnexsen.com

---

[12] Based on our conversations with Mr. Doug Mickle, we have held off on filing a preliminary injunction application, understanding the parties can likely work out a voluntary stay of award and briefing schedule.  ADRS reserves the right to ask for preliminary injunctive relief should changed circumstances warrant doing so.

23

Ashley H. Hamlett
General Counsel
Alabama Department of
Rehabilitation Services
602 S. Lawrence Street
Mongomery, AL 36104
ashley.hamlett@rehab.alabama.gov

*Attorneys for Alabama Department of*
*Rehabilitation Services*


## Certificate of Service


      I hereby certify that on February 19, 2026, I caused copies of the foregoing to be served

by electronic mail upon the following:

        U.S. Department of Justice
        Commercial Litigation Branch
        National Courts Section
        P.O. Box 480
        Ben Franklin Station
        Washington, D.C., 20044

                   /s/ W. Brad English
                   Of Counsel